IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NATALIE HARRINGTON,

                    Plaintiff,

     v.

GEORGE FOX UNIVERSITY,

                    Defendant.

No. 3:18-cv-00846-HZ

OPINION & ORDER

Christina Stephenson
Meyer Stephenson
1 SW Columbia Street, Suite 1850
Portland, OR 97258

Michael Owens
Owens & McBreen, P.C.
319 SW Washington Street, Suite 614
Portland, OR 97204

      Attorneys Plaintiff

Lloyd Bernstein
Alexander Hill
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Natalie Harrington brings this sex discrimination claim under Title VII, Title IX, the Equal Pay Act, and Or. Rev. Stat. § (O.R.S.) 659A.030(1)(b) against her former employer, Defendant George Fox University ("the university"). Defendant moves for summary judgment on all of Plaintiff's claims. The Court grants in part and denies in part Defendant's motion for summary judgment.

## BACKGROUND

      Defendant is a university that has several athletic programs, some of which are National Collegiate Athletic Association ("NCAA") Division III teams. Bernstein Decl. Am. Ex. 2 ("Trask Dep.") 11:25–12:2, ECF 34-1; Bernstein Decl. Am. Ex. 5 ("Hollen Dep.") 60:18–61:3, ECF 34-3. Each of the university's athletic teams has a head coach who is either a full-time or part-time university employee. Bernstein Decl. Am. Ex. 6 ("Taylor Dep.") 12:3–17, ECF 34-4. Depending on the size of the team and athletic department resources, each team has one or more assistant coaches who are volunteers, paid by seasonal stipend, or part-time or full-time university employees. *Id.*; Trask Dep. 14:3–9, 15:3–14.

      Defendant hired Plaintiff as the head coach for the inaugural season of its women's lacrosse team in May 2013. Harrington Decl. ¶ 2, ECF 30. The same month, Defendant hired a part-time women's soccer coach, Cory Hand. Harrington Decl. ¶ 4; Bernstein Decl. Ex. 8b, ECF 23. At that time, women's lacrosse was not an NCAA-recognized sport. Trask Dep. 36:8–9. The

women's lacrosse head coach position was a part-time position, and Defendant paid Plaintiff an initial salary of $20,000 per year. Harrington Decl. ¶ 3. Plaintiff signed an eight-month contract with Defendant for 2013–2014 lacrosse season that required seven months of work.[1] Drew Decl. Ex. 4, ECF 25. Cory Hand signed a nine-month contract that required eight months of work for an annual salary of $20,000 for the 2013–2014 school year.[2] Bernstein Decl. Ex. 8b.

The university's fiscal year runs from July to July. Taylor Dep. 55:16–19. The athletic department submits its budget to the university between January and April for the following fiscal year. *Id*. at 55:16–21. A cabinet of vice presidents reviews each department's proposed budget, makes funding decisions based on the university's institutional priorities, and communicates its decision back to the departments. Bernstein Decl. Am. Ex. 7 ("Lau Dep.") 10:10–11:11, ECF 34-5. The budgets are confirmed annually in September when fall enrollment is complete. Taylor Dep. 55:24–56:5. The athletic department did not have sufficient funding to make all head coaches full-time employees. Trask Dep. 15:24–16:24. The athletic department decided which coaches would receive full-time coaching positions based on the roster size of the coach's team, coach-to-athlete ratios, whether the department had invested significant resources in the team or sport in the past, and how much funding was available overall. Hollen Dep. 20:15– 21:24, 60:10–17; Trask Dep. 16:5–13.

Because the athletic department did not have enough funding to make all head coaches full-time university employees, the department looked for ways that it could use its coaches to meet athletic department staffing needs by assigning them non-coaching athletic department

---

[1] Plaintiff's contract ran for a period of eight months from August 15, 2013, through April 14, 2014, with an "off-contract month" consisting of three weeks at Christmas break and one week at spring break. Drew Decl. Ex. 4.

[2] Mr. Hand's contract ran for a period of nine months from July 1, 2013, through March 31, 2014, with an "off-contract" month consisting of three weeks at Christmas break and one week at spring break. Bernstein Decl. Ex. 8b.

responsibilities that would bring the coaches closer to full-time employment. Taylor Dep. 47:19–48:10. The athletic department's goal was to eventually make all its head coaches full-time university employees. Trask Dep. 16:14–24; Taylor Dep. 55:8–15; Hollen Dep. 12:18–13:7.

In her position as head women's lacrosse coach, Plaintiff recruited members of the team, trained them, and coached them in their first season, which ended with a .500 record. Harrington Decl. ¶¶ 3, 6; Taylor Dep. 10:20–11:5; Bernstein Decl. Am. Ex. 4 ("Harrington Dep.") 22:25–23:14, 25:6–25, ECF 34-2. After her first season as head coach, Plaintiff asked Defendant to make her position full time. Harrington Decl. ¶ 6. Defendant did not give Plaintiff a full-time position, but it increased her salary to $21,000 for the 2014–2015 season. *Id.*; Bernstein Decl. Ex. 4a at 1. Plaintiff signed another eight-month contract requiring seven months of work for the 2014–2015 school year in August 2014. Drew Decl. Ex 5, ECF 25. Mr. Hand signed a nine-month contract for eight months of work at an annual salary of $21,000 for the 2014–2015 school year. Bernstein Decl. Ex. 8c at 2. In late 2014, the athletic department employees discussed the department's goal to make head coaches full-time university employees and discussed prioritizing making Plaintiff and Cory Hand full-time employees. Stephenson Decl. Ex. 14 at 1, ECF 31-14.

Plaintiff's second season ended in or around May 2015 with a winning record. Harrington Decl. ¶ 7. In April 2015, Plaintiff again requested a full-time position. Bernstein Decl. Ex 4b at 1. Defendant's Director of Athletics, Craig Taylor, told Plaintiff that Defendant would not be able to make her position full time. *Id.* However, Defendant offered her the additional position of Intramural Sports Director, which would increase her responsibilities and pay her an additional $6,000 per year. Harrington Dep. 61:8–21. In July 2015, Defendant gave the women's soccer coach, Cory Hand, the additional responsibilities of Director of Facilities and Spring Game

Management, which came with an additional $20,000 salary added to his $21,000 coaching salary. Mr. Hand signed a ten-month contract beginning July 1, 2015, for $41,000 per year. Bernstein Decl. Am. Ex. 8 ("Hand Dep.") 34:6–8, Bernstein Decl. Ex. 8d, ECF 23.

During Plaintiff's third season as the head coach of Defendant's women's lacrosse team in 2015–2016, the team tied for the conference title with another university. *Id.* at 75:4–9. At the end of that season, Plaintiff requested that Defendant make her a full-time head coach, and Defendant told her that it could not make her position full time due to budget constraints. Harrington Dep. 77:4–15; Harrington Decl. ¶ 9. Plaintiff returned to coach women's lacrosse at the university for a fourth season in the fall of 2016. Harrington Dep. 77:16–78:1. Defendant's women's lacrosse team had another successful season that year when the team finished the season with a 12-2 record and won the conference championship. Harrington Decl. ¶ 10.

After her fourth season as head women's lacrosse coach, Mr. Taylor told Plaintiff that he would try to make her position full-time for the 2017–2018 season, but he was unable to. Harrington Dep. 92:9–16; Harrington Decl. ¶ 10. On or about April 25, 2017, Plaintiff resigned from her position as head coach of the women's lacrosse team effective May 9, 2017. Bernstein Decl. Ex. 4c, ECF 22-1; Harrington Dep. 93:2–14.

On April 26, 2017, Mr. Taylor emailed Mr. Lau, Defendant's Vice President of Student Life, to ask if it would be possible to advertise the women's lacrosse head coach vacancy as a full-time position with a salary of around $48,000 per year plus benefits. Stephenson Decl. Ex. 34 at 1, ECF 31-19. Mr. Lau responded that the university would not be able to increase the budget to make the position full time because that would require a reallocation of funds within the current athletics budget. *Id.* Mr. Lau added that for the right candidate, however, Defendant

may be able to offer a new coach more than the budgeted $21,000 per year for the part-time

position. *Id*. at 4.

In May 2017, Plaintiff spoke with Mr. Lau. Harrington Dep. 110:19–111:1; Bernstein

Decl. Ex. 2 ("Trask Dep.") 37:17–19, ECF 34-1. According to Plaintiff, Mr. Lau told her that

that the reason that Defendant did not promote her to a full-time position was not because of her

experience or coaching record, it was because Defendant "lacked any sort of strategy for

determining who will, and who will not, be promoted to full-time." Harrington Decl. ¶ 12. Mr.

Lau's recollection of that conversation was that he was unsure why Plaintiff was not promoted to

full time, but he offered to remove intramurals from her responsibilities and let her keep the

additional $6,000 salary if she would stay. Lau Dep. 47:3–48:10, 60:7–16. Plaintiff declined, and

Mr. Lau's impression was that Plaintiff had moved on and was uninterested in continuing to

coach at George Fox. *Id*. at 48:7–10. Mr. Taylor had the same impression when Plaintiff told Mr.

Taylor that she was leaving—he believed that she probably had a better opportunity coaching

elsewhere, and she had discussed with Mr. Taylor that she might pursue employment as a

firefighter. Taylor Dep. 65:10–66:3.

After speaking with Plaintiff, on May 8, 2017, Mr. Lau told Plaintiff in an email, "I'm

not sure that I have a better answer regarding why you weren't granted full-time. Honestly, it

seems as though some of it is simply because there isn't an agreed upon strategy in athletics for

how programs are staffed and supported." Stephenson Decl. Ex. 36 at 2; Lau Dep. 50:5–15.

After Plaintiff resigned, she moved to Los Angeles from May 2017 until early July 2017.

Harrington Dep. 102:5–9; 115:16–22; 120:23–121:5. Plaintiff coached lacrosse for a club called

Bay Area WAVE during the months that she lived in Los Angeles. Harrington Dep. 104:23–

105:17. When she returned to Oregon in July 2017, Plaintiff worked as an emergency medical

technician ("EMT") at Metro West Ambulance until she began coaching lacrosse for a club called 3d Lacrosse in January 2018. 3d Lacrosse paid her a salary of $40,000 per year plus benefits. Harrington Dep. 100:5–12, 153:18–154:1. Plaintiff also coached lacrosse at Lincoln High School for an annual salary of $8,000 per year. Harrington Dep. 155:12–14, 156:16–22. At the time of her deposition, Plaintiff was undergoing testing to pursue employment as a police officer. Harrington Dep. 175:15–176:19.

When Defendant hired Plaintiff's replacement, it hired a female full-time head lacrosse coach who had additional university responsibilities. Trask Dep. 45:1–8; Stephenson Decl. Ex. 37 at 14,[3] ECF 31-21. The university's new tennis facility had been scheduled to open in the fall of 2017, so Mr. Taylor and Ms. Trask proposed to Mr. Lau in early May 2017 that the athletic department reallocate the budget resources that the university previously had dedicated to renting tennis facilities to fund a full-time head lacrosse coach position. Taylor Dep. 58:19–59:17, 60:1–4. Mr. Taylor testified that he knew that the new tennis facility would open sometime during the fall of 2017, but he did not know exactly when, so he was unable to reallocate the funds from tennis to lacrosse to offer Plaintiff full-time employment before she resigned. *Id.* 60:16–61:16. Mr. Lau agreed to make the position full-time on May 18, 2017. Trask Dep. 58:21–59:2.

In addition to hiring a full-time female head lacrosse coach, Defendant also hired a full-time female head coach for the men's and women's swimming teams in 2017. Lau Dep. 19:20–20:3; Stephenson Decl. Ex. 37 at 12. The head swimming coach received a full-time position with additional teaching responsibilities that accounted for about twenty-two percent of her time. Stephenson Decl. Ex. 37 at 12.

///

---

[3] Citations to this exhibit are to ECF page numbers because Plaintiff did not include page numbers on the exhibit.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

### I.    Plaintiff's Title VII Claim

A plaintiff may prevail on summary judgment by providing direct evidence of discrimination or by relying on circumstantial or indirect evidence and satisfying the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981). *Swierkiewica v. Sorema, N.A.*, 534 U.S. 506, 511–12 (2002); *see also Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029-30 (9th Cir. 2006) (plaintiff may rely successfully on either circumstantial or direct evidence to defeat a motion for summary judgment in a civil action under Title VII).

Although a plaintiff is not required to defeat summary judgment by reliance on the burden-shifting formula articulated in *McDonnell Douglas*, the parties here have relied on that formula to resolve the motion. The burden-shifting framework requires the plaintiff to first establish a prima facie case of unlawful discrimination, which shifts the burden of production to the defendant to articulate a legitimate, nondiscriminatory reason for its action. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 n.16 (9th Cir. 2004). If the defendant does so, the burden returns to the plaintiff to show that the articulated reason is pretext for intentional discrimination. *Id.*; *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 658–59 (9th Cir. 2002).

Defendant argues that Plaintiff has failed to make a prima facie case of discrimination. Def. Mot. Summ. J. ("Def. Mot.") 12, ECF 21. Even if she has, Defendant argues, she has failed

to establish that the legitimate, non-discriminatory reasons offered by Defendant to explain its employment decisions were pretext for intentional discrimination. *Id*. at 21.

### A.    Plaintiff's Prima Facie Case

Defendant argues that Plaintiff has failed to make a prima facie case of intentional discrimination. *Id*. at 12. Plaintiff does not argue that direct evidence of discrimination exists and relies only on circumstantial evidence of discrimination. Pl. Resp. Mot. Summ. J. ("Pl. Resp.") 7–8, ECF 29. To establish a prima facie case of discrimination through circumstantial evidence, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang*, 225 F.3d at 1123 (citing *McDonnell Douglas*, 411 U.S. at 802). The "requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id*. at 1124. However, the evidence must "give rise to an inference of unlawful discrimination." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Defendant does not dispute that Plaintiff is a member of a protected class and was qualified for the position of full-time head women's lacrosse coach. Def. Mot. 13–14. Defendant argues that Plaintiff cannot establish the other two factors necessary to establish a prima facie case—that she was subject to an adverse employment action and that similarly situated male employees were treated more favorably than Plaintiff. *Id*. at 14.

### i.    Adverse Employment Action

An adverse employment action is one that materially affects the compensation, terms, conditions, or privileges of employment. *Chuang*, 225 F.3d at 1125 (citing 42 U.S.C. § 2000e-

2(a)(1)). An employment action is adverse when "a reasonable employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Plaintiff claims that she suffered adverse employment actions when Defendant denied her a promotion, paid her less for equal work, required her to work more hours, and denied her the assistance of full-time assistant coaches. Compl. ¶ 21, ECF 1. The Court addresses each alleged adverse employment action.

> a.    Failure to Promote

Plaintiff has produced sufficient evidence to establish that Defendant denied her a promotion to full-time employment. Failure to promote is an adverse employment action. *Breiner v. Nev. Dep't of Corr.*, 610 F.3d 1202, 1207 (9th Cir. 2010); *Brooks v. City of San Mateo* 229 F.3d 917, 928 (9th Cir. 2000). Plaintiff produced undisputed evidence that (1) Cory Hand was hired at the same time as Plaintiff to coach a women's sport at the university; (2) Plaintiff requested promotion to full-time employment every year; and (3) in 2015, Defendant gave Mr. Hand full-time responsibilities and did not promote Plaintiff to full-time employment. Those facts are sufficient to create a question of fact concerning whether a reasonable employee would have found the decision not to promote Plaintiff to full-time employment materially adverse. As a result, Plaintiff has met her burden to demonstrate that she suffered an adverse employment action. *See Breiner*, 610 F.3d at 1207.

> b.    Job Duties

Plaintiff also argues that she can make a prima facie case of discrimination by demonstrating a series of actions by Defendant that combined to create a materially adverse action. Pl. Resp. 9. Plaintiff argues that because Defendant provided her fewer assistant coaches than it provided to other head coaches, Plaintiff had to complete more of the administrative tasks

herself, diminishing her availability for player development, game development, and recruiting, which undermined her ability to be a successful coach. *Id*. An employer may subject an employee to an adverse employment action when it assigns different duties to two employees in the same position. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008) (assignment of a disproportionate amount of hazardous work compared to coworkers); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (transfer of job duties); *Marquez v. Harper Sch. Dist. No. 66*, No. CV-09-1254-SU, 2011 WL 2462035, at *10–11 (D. Or. Mar. 24, 2011) (gender-based division of duties between two custodians).

Plaintiff produced evidence that Defendant assigned her different job duties than it assigned to Cory Hand in 2015 when it added athletic department responsibilities to their coaching duties. Defendant assigned Mr. Hand the duties of spring game management and the Director of Facilities position, which came with a salary increase of $20,000 per year. Bernstein Decl. Ex. 8d. At the same time, Defendant gave Plaintiff the position of Director of Intramural Sports, which came with a salary increase of only $6,000 per year. Harrington Decl. ¶ 9. The duties assigned to Plaintiff and Mr. Hand were different, and there was a significant disparity in the salary increase that came with their additional duties. A reasonable employee in Plaintiff's position may have considered the difference in job duties and salary to have been materially adverse. As a result, Plaintiff has produced sufficient evidence to create a question of fact concerning whether she experienced an adverse employment action on that basis.

        c.      Failure to Provide Assistant Coaches

Plaintiff also claims that she was required to work more hours than other head coaches because she did not have as many assistant coaches as other head coaches. Compl. ¶ 21. She explained that with a full-time assistant coach or additional part-time assistant coaches to handle

the administrative tasks associated with running the team, she would have been more available to her student athletes when issues arose and would have been able to focus more on coaching the athletes on her team. Harrington Dep. 112:13–113:5, 135:8–136:13. Plaintiff, at least by 2016, had two assistant coaches. Harrington Dep. 75:16–20; Stephenson Decl. Ex. 11 ("Beaty Decl.") ¶ 2, ECF 31-11; Stephenson Decl. Ex. 12 ("Coulton Decl.") ¶ 2, ECF 31-12.

Evidence in the record demonstrates that Cory Hand and other male head coaches had more assistant coaches than Plaintiff. Cory Hand had three assistant coaches. Stephenson Decl. Ex. 37 at 11. The football head coach had two full-time assistant coaches. Bernstein Decl. Am. Ex. 2 15:15–19, ECF 34-1. The baseball team had five assistant coaches, one of which was a full-time employee. Stephenson Decl. Ex. 4 ("Kopple Dep.") 11:8–19, 12:2–6, ECF 31-4; Trask Dep. 50:5–13. Thus, other head coaches had more assistant coaches than Plaintiff, which a reasonable employee may have believed to be materially adverse.

d.    Lower Pay for Equal Work

Defendant argues that there is no evidence to support Plaintiff's allegation that she was paid less than her male counterparts for equal work. Plaintiff argues that although the university considered her a part-time employee, to fulfill her responsibilities as lacrosse head coach and director of intramural sports, she had to work full-time hours. Compl. ¶ 21; Harrington Dep. 143:1–21. Although the part-time head coaches had eight- or nine-month contracts, several other coaches testified that they recruited players during the off-season of their sports. Hand Dep. 35:4–11, 36:22–37:13; Hollen Dep. 58:24–59:9; Kopple Dep. 9:16–24. Although Defendant paid Plaintiff and Mr. Hand the same salary during the 2013–2014 and 2014–2015 seasons, Plaintiff's contract required seven months of work and Mr. Hand's contract required eight months of work. Drew Decl. Ex. 4, 5; Bernstein Decl. Ex. 8b, 8c at 2. Plaintiff testified that the optimal time of

year for recruiting lacrosse athletes was during the summer, outside of her contract. Harrington Dep. 143:1–13. But off-season recruiting was something that all head coaches had to do because it was part of their job duties. Hollen Dep. 58:24–59:18; Hand Dep. 34:21–35:11. In addition, Mr. Hand had to coach about twice as many athletes in about twice as many games per year as Plaintiff. Trask Dep. 36:1–15. The evidence in the record thus fails to demonstrate a question of fact that Plaintiff was required to work more hours than male employees. Plaintiff has failed to demonstrate that she suffered an adverse employment action on that basis.

ii.    Similarly Situated Male Employees

To establish that other employees are similarly situated, Plaintiff must show that the employees are similar in "all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). The employees' roles need not be identical for the employees to be similarly situated in all material respects. *Hawn v. Exec. Jet Mgm't, Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010). Materiality depends on the particular facts and the context in which they arise. *Id*. To establish a prima facie case, a plaintiff needs to show that other employees "have a situation sufficiently similar to Plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (9th Cir. 2001).

Plaintiff argues that Mr. Hand was similarly situated in all material respects. Pl. Resp. 10. Defendant argues that Mr. Hand was not a similarly situated employee because the women's soccer program was too dissimilar from the women's lacrosse program. Def. Mot. 19. Specifically, Defendant argues that the differences between the soccer and lacrosse teams in terms of roster size, season timing (soccer being a fall sport and lacrosse being a spring sport), and NCAA conference recognition, and the two coaches' different educational and professional backgrounds make them not similarly situated in all material respects. *Id*. at 19–20.

Plaintiff and Mr. Hand were coaches of women's college sports teams with similar pay, similar job expectations, and they answered to the same supervisors. Any differences in their education and work experience were not material to their duties and expectations as head women's sports coaches. As Plaintiff points out, Defendant considered Plaintiff and Mr. Hand similarly situated when it prioritized making them full-time employees, which supports an inference that any differences between them were not material. Hollen Dep. 65:9–18; Stephenson Decl. Ex. 14 at 1. In fact, in 2014, Jessica Hollen proposed an equal division of additional athletic department duties between Plaintiff and Mr. Hand in order to bring them both closer to full time. Stephenson Decl. Ex. 14 at 1.

Of the three coaches who received full-time university responsibilities in 2015, two of them were male. Kopple Dep. 9:1–5; Hollen Dep. 8:12–14; Hand Dep. 34:4–8. The majority of the university's head coaches who already had full-time positions at that time were male. Kopple Dep. 9:1–5; Hollen Dep. 8:12–14; Hand Dep. 34:4–8; Bernstein Decl. Ex. 8b. As a result, Plaintiff has produced sufficient evidence to support a minimal inference of sex-based discrimination based on Defendant's more favorable treatment of male employees.

Defendant adds, in its reply, that Plaintiff and Mr. Hand were not similarly situated because the additional job duties that Defendant assigned them were different. Def. Reply 3–4, ECF 32. Defendant argues that the differences between Plaintiff's duties as Director of Intramurals and Mr. Hand's duties as Director of Facilities establish that Plaintiff and Mr. Hand are not similarly situated employees. *Id.* However, that difference in job duties occurred because of the alleged discrimination and has no bearing on whether Plaintiff and Mr. Hand were similarly situated when Defendant decided which coach to promote to full time by assigning those additional duties. Defendant also argues in its reply that Mr. Hand had more extensive

education and more administrative, teaching, and coaching experience than Plaintiff, yet he was paid the same amount for his part-time coaching position. However, none of the evidence in the record establishes that Mr. Hand's education and experience was a factor that Defendant considered when deciding whether Mr. Hand would get full-time pay and responsibilities. *See* Stephenson Decl. Ex. 14 at 1. As a result, it does not undermine the inference of sex-based discrimination.

Defendant argues that Plaintiff produced no evidence that she was qualified for the Director of Facilities position. However, the evidence in the record suggests that Defendant did not require specific qualifications for that position. *See* Hollen Dep. 65:9–66:1 (explaining that the reason Defendant promoted Hand to full-time was that he coached a conference-recognized sport); Stephenson Decl. Ex. 14 at 1 (proposing that Plaintiff and Mr. Hand each work four-hour shifts at one of the facilities, Plaintiff oversees work study students, and Mr. Hand oversees "SAAC and FCA"). The Director of Facilities position seems to have been a year-round position that involved management of a budget and hiring and supervising student workers in the fitness facility. Those duties are similar to the duties Defendant required Plaintiff to perform in the Director of Intramurals Position. The reason that Defendant did not consider Plaintiff for the Director of Facilities position or split those duties between Plaintiff and Mr. Hand, despite Plaintiff's requests for full-time responsibilities, is not in the record. Defendant's apparently arbitrary decision to give the Director of Facilities position to Mr. Hand instead of Plaintiff creates an inference of sex-based discrimination sufficient to put that question to a jury.

### B.    Reasons for Adverse Action Articulated by Defendant

Plaintiff does not dispute that Defendant met its burden of production to articulate legitimate, non-discriminatory reasons for offering Mr. Hand a full-time position before Plaintiff.

Pl. Resp. 11–13. She argues that those reasons, however, were pretext for intentional discrimination.

### C.    Pretext

Once the defendant has produced legitimate, non-discriminatory reasons for the adverse employment action, "the presumption of discrimination 'drops out of the picture,'" and the plaintiff must produce specific and substantial evidence that the defendant's reasons for denying the plaintiff a full-time position were mere pretext for discrimination. *Cornwell*, 439 F.3d at 1028 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)); *Aragon*, 292 F.3d 654 at 661. The plaintiff can establish pretext "(1) indirectly by showing that [the] defendant's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the defendant." *Whitley v. City of Portland*, 654 F. Supp. 2d 1194, 1207 (D. Or. 2009) (quotation marks omitted). The burden of persuading the fact finder remains with the plaintiff. *Burdine*, 450 U.S. at 253. In a disparate treatment case, "liability depends on whether the protected trait . . . actually motivated the employer's decision" and whether it "had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). A reasonable juror may conclude that the employer's reason for an adverse employment action was pretextual when the employer gives "fundamentally different justifications" for the adverse action. *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004).

Plaintiff raises two pretext arguments. First, she argues that Defendant's reasons are post-hoc and have changed over time, so they are "unworthy of credence." Pl. Resp. 13. Second, she argues that she was more qualified than Mr. Hand to receive full-time responsibilities because of her team's winning record and her experience competing in Division I collegiate lacrosse. *Id.* at

15. Thus, Plaintiff argues, gender discrimination was likely the reason that Mr. Hand received a full-time position instead of her.

Plaintiff's argument that Defendant's reasons are post-hoc and have shifted over time is based on the testimony of Brad Lau, the Vice President of Student Life, who began to oversee the university's athletics department in late April 2017. *Id.* at 14. Mr. Lau testified during his deposition that he did not know why Plaintiff did not receive a full-time position, but he knew that the athletic department made decisions about full-time employment of coaches based on roster size, roster potential, conference recognition of the sport, and university enrollment objectives. Lau Dep. 23:6–20, 53:25–54:21. Mr. Lau told Plaintiff in May 2017, after she resigned, that the reason Defendant did not give her full-time hours was that "there isn't an agreed upon strategy in athletics for how programs are staffed and supported." Stephenson Decl. Ex. 36 at 2. Plaintiff argues that the Court should not believe that insufficient budget resources and low budget priority were the true reasons that Defendant did not give Plaintiff a full-time position because those are post-hoc explanations that are inconsistent with the university's admission that it wanted to prioritize giving Plaintiff a full-time position. The Court agrees that a reasonable juror could conclude that Defendant's post-hoc explanation is unworthy of credence.

The undisputed record evidence establishes that there was room in the budget to offer a coach the Director of Facilities, game management, and Director of Intramurals positions, and Defendant gave the position with the fewest hours and lowest salary to Plaintiff. Although the evidence supports Defendant's argument that there were insufficient budget resources to give both coaches full-time positions, the evidence is devoid of any explanation as to why Defendant chose Mr. Hand instead of Plaintiff to receive the full-time position. Defendant explained that Plaintiff could not have performed the duties associated with spring game management because

those duties would have conflicted with her coaching duties since lacrosse was a spring sport. But Defendant offered no explanation as to why Plaintiff could not have performed the duties of Director of Facilities and Director of Intramurals to create a full-time position or, as Ms. Hollen proposed, split those duties to make both Plaintiff and Mr. Hand full-time employees. As a result, a reasonable juror could conclude that Plaintiff's sex was the reason that she did not receive the Director of Facilities position. *See Hernandez*, 362 F.3d at 569 ("'[W]hen a company, at different times, gives different and arguably inconsistent explanations [regarding its reasons for terminating an employee], a jury may infer that the articulated reasons are pretextual.'") (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)).

## II.    Plaintiff's State Law Gender Discrimination Claim

Standards used to analyze federal Title VII claims apply to claims brought under Oregon's employment discrimination statutes, Or. Rev. Stat. ("O.R.S.") Chapter 659A. *E.g., Conley v. Lincoln City*, No. CV-02-216-AS, 2004 WL 948427, at *13 (D. Or. Apr. 20, 2004) (Oregon courts consistently hold that case law developed by federal courts in the interpretation of Title VII is used to interpret Chapter 659); *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (*McDonnell Douglas* burden-shifting scheme applies to discrimination claims under Oregon statutes litigated in federal court).

The parties agree that Plaintiff's state law sex discrimination claim should be analyzed in the same manner as her Title VII claims. As a result, because the Court finds that questions of material fact preclude summary judgment on Plaintiff's Title VII claims, the Court denies Defendant's motion for summary judgment on Plaintiff's state law discrimination claim for the same reasons.

///

### III.    Plaintiff's Title IX Claim

Plaintiff's Title IX claim alleges sex discrimination and constructive discharge. Compl. ¶ 35. The parties agree that the Court should analyze Plaintiff's Title IX sex discrimination claim in the same manner as it analyzes her Title VII and state law discrimination claims. Thus, the Court denies Defendant's motion for summary judgment on Plaintiff's Title IX sex discrimination claim for the same reasons it denies summary judgment on Plaintiff's Title VII claims. *See Ollier v. Sweetwater Un. High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014) (applying Title VII retaliation analysis to Title IX retaliation claim because the Supreme Court has "often looked to its Title VII interpretations . . . in illuminating Title IX."). With respect to Plaintiff's Title IX constructive discharge claim, Defendant argues that Plaintiff has produced no evidence that the extraordinary circumstances necessary to support a claim for constructive discharge were present when she resigned, so the Court should grant Defendant summary judgment on that claim. Def. Mot. 24.

To prove a constructive discharge, the plaintiff must show that "the abusive working environment became so intolerable that resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004). To do so, the plaintiff must show that the employer "create[d] working conditions that [were] 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood.'" *Poland v. Chertoff*, 494 F.3d 1174, 1186 (9th Cir. 2007) (quoting *Brooks*, 229 F.3d at 930). To do so, the plaintiff must show that the working conditions were worse than those that a reasonable person could tolerate. *Id*. at 1185. "[C]onstructive discharge cannot be based upon the employee's subjective preference for one position over another." *Id*. (quotations omitted).

To survive summary judgment, Plaintiff "must show there are triable issues of fact as to whether a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions." *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005) (internal quotation omitted), *amended*, 433 F.3d 672, 436 F.3d 1050 (9th Cir. 2006). Although a "single isolated incident is insufficient as a matter of law to support a finding of constructive discharge," courts have "upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." *Id*. (internal quotation omitted). Plaintiff must at least "show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Wallace*, 479 F.3d at 626 (internal quotation omitted).

The evidence offered by Plaintiff in support of her constructive discharge claim is her testimony that she found it intolerable to continue in a job where she was passed over for a promotion to full-time employment that Defendant gave to a male employee instead. Plaintiff testified:

> The fact that I was not able to obtain full-time work was not feasible for my life anymore, and I had no other choice. I felt like I had no other choice but to resign.
>
> . . . .
>
> Just the work environment was not good for me at that point. You know, at George Fox, there were like little things here and there, you know, with Cory Hand, that him and I didn't get along. Other than that, I had a good working relationship face to face with most people. But the fact that others were granted full time over me, and I would see them with office supplies that I didn't have or a computer or phones or a new office or stuff like that, it was so difficult to walk into that office space and walk into George Fox, knowing about the opportunity others were getting over me. And that quickly became very difficult for me to emotionally deal with at the time of working for George Fox, and I couldn't put myself through that for another year.

Harrington Dep. 124:13–16; 124:23–125:13. Plaintiff argues that "suffering through four years of unequal support and unequal treatment" is enough evidence to put the question of whether she

was constructively discharged to a jury. Pl. Resp. 10. The Court agrees. After Defendant declined to offer her full-time employment in 2014 and 2015, Defendant offered Mr. Hand full-time employment in 2015. Defendant continued to refuse Plaintiff's requests for full-time employment in 2016 and 2017, despite her good performance, and gave her replacement a full-time position. From the evidence in the record, a reasonable juror could conclude that "a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions." *Hardage*, 427 F.3d at 1184. As a result, determining whether Plaintiff suffered a constructive discharge is a task for the jury.

## IV.    Plaintiff's Equal Pay Act Claim

Defendant moves for summary judgment on Plaintiff's claims under the Equal Pay Act of 1963, and Plaintiff concedes that this claim should be dismissed. Def. Mot. 25–26; Pl. Resp. 23. Accordingly, Plaintiff's Equal Pay Act claim is dismissed with prejudice.

## V.    Damages

Plaintiff's Complaint alleges that she is entitled to reinstatement or damages for future lost wages, benefits, and lost earning capacity. Compl. ¶ 25. Defendant argues that Plaintiff's claims should be dismissed for lack of damages because (1) there is no evidence to support her claim of lost wages and benefits, and any award of damages in this case would require the jury to speculate; and (2) Defendant did not cause Plaintiff's lost wages, lost benefits, earning capacity, and noneconomic damages under any of Plaintiff's theories of recovery because Plaintiff voluntarily left her employment and Defendant did not discriminate against her. Defendant also argues that Plaintiff's claim for injunctive relief is vague and overbroad and should be dismissed as a matter of law. Def. Mot. 26–30.

According to Defendant, Plaintiff is not entitled to recover her lost wages, benefits, and lost earning capacity because she made $40,000 per year coaching club lacrosse after she resigned, which was more than she made at her part-time position at George Fox. Def. Mot. 27–28. That salary, Defendant argues, was approximately the same amount that Plaintiff would have earned as a full-time coach at George Fox, and she had the same benefits coaching club lacrosse as she had at George Fox. *Id.* Defendant also argues that Plaintiff is not entitled to damages for lost earning capacity because she voluntarily left her job at Tenacity Project in 2017, where she earned $37,000 per year during the last two seasons that she worked at George Fox. *Id.* at 27. Finally, Defendant argues that it did not cause her damages because her applications for other jobs admit that she resigned because she wanted to change careers, not because of intentional discrimination. *Id.* at 27–28. Finally, Defendant argues that Plaintiff's claim for noneconomic damages is too speculative because she did not receive treatment for her alleged emotional distress and thus cannot prove her emotional distress claim. *Id.* at 28.

### A.    Back Pay and Front Pay

Title VII of the Civil Rights Act of 1964 permits courts to award compensatory and equitable remedies to employees who have been impermissibly discriminated against by employers with fifteen or more employees. *See* 42 U.S.C. § 2000e–5(g) (1994). Title VII remedies "include reinstatement and awards of back pay and front pay." *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000). An award of back pay is appropriate to advance "Congress' intent to make 'persons whole for injuries suffered through past discrimination.'" *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)). Title VII presumes awards of back pay. *Caudle*, 224 F.3d at 1020 (citing *Albemarle Paper*, 422 U.S. at 421). "Front pay is the term used to describe damages

paid as [prospective] compensation for training or relocating to another position. An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Fadhl v. City and Cnty. of S.F.*, 741 F.2d 1163, 1167 (9th Cir. 1984), *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). "[R]einstatement, when it is feasible, is the 'preferred remedy' in a discrimination suit" in lieu of front pay. *Caudle*, 224 F.3d at 1020 (quoting *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1156 (9th Cir. 1999)).

      1.    Back Pay

Plaintiff argues that she is entitled to back pay, which requires only proof of the amount she earned at George Fox and the amount she would have earned if Defendant had promoted her to full-time employment, which is in the record. The Court agrees. *See Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1449 (9th Cir. 1990) (affirming district court's award of back pay calculated by determining the difference between what the plaintiff previously earned and what the plaintiff would have earned if the defendant had promoted her). Plaintiff argues that she would have earned "around $48,000 per year" for the last two years of her employment at George Fox if Defendant had promoted her to full-time, and instead she earned $21,000 per year, a difference of $27,000 per year. Pl. Resp. 18–19. Thus, Plaintiff argues, she is entitled to back pay of $54,000 for those two years. *Id.* It appears that Plaintiff bases her argument that she would have earned $48,000 per year in a full-time position on the email that Mr. Taylor sent Mr. Lau after Plaintiff resigned. In that email, Mr. Taylor asked Mr. Lau for authority to offer the new head women's lacrosse coach a full-time position with a salary of $48,000 per year. Stephenson Decl. Ex. 34 at 2. Mr. Lau did not agree. *Id.*

Although Defendant made the head lacrosse coach position full-time after Plaintiff resigned, the annual salary that Defendant paid Plaintiff's replacement never reached $48,000, according to the evidence in the record, even with the assignment of additional university responsibilities. Defendant paid Plaintiff's replacement $42,924 per year (with added teaching responsibilities) and paid Mr. Hand $41,000–$43,167 per year for his full-time employment. Stephenson Decl. Ex. 37 at 11, 14; Bernstein Decl. Ex. 8b. Regardless of the exact amount that Plaintiff would have earned to perform full-time responsibilities, it is undisputed that Plaintiff would have earned more than her part-time salary of $27,000 per year. That evidence is sufficient to create a question of fact concerning whether she is entitled to back pay, particularly in light of the presumption in favor of back pay. *See Caudle*, 224 F.3d at 1020 (citing *Albemarle Paper*, 422 U.S. at 421). Because a question of fact remains concerning whether Defendant would have made Plaintiff a full-time university employee but for unlawful discrimination, the evidence in the record demonstrating the difference between Plaintiff's part-time salary and other coaches' full-time salaries establishes a question of fact concerning whether Plaintiff is entitled to back pay.

Defendant also argues that Plaintiff is not entitled to back pay damages because it offered to reinstate Plaintiff twice after she resigned. Back pay damages normally accrue "until the employer makes an unconditional offer of reinstatement." *Polynesian Cultural Ctr. v. N.L.R.B.*, 582 F.2d 467, 475 (9th Cir. 1978). "[A]bsent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 241 (1982), *superseded on other grounds by statute as recognized in McCoy v. Oscar Mayer Foods*, 108 F.3d 1379 (7th Cir. 1997) (unpublished opinion). Whether special circumstances demonstrate that an employee's refusal of an offer of reinstatement was

reasonable is a question of fact for the jury. *Ortiz v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 852 F.2d 383, 387 (9th Cir. 1987). Plaintiff argues that although Defendant offered Plaintiff her job back, the offers were not unconditional offers of reinstatement, and her rejections of the offers were reasonable, so the offers did not curtail her ongoing back pay damages. The Court agrees.

In May 2017, Mr. Lau offered Plaintiff the chance to return to her former position as the part-time head lacrosse coach at her former salary but without additional duties as the Director of Intramurals. He declined to offer Plaintiff a full-time position at that time. Harrington Decl. ¶ 12; Lau Dep. 47:20–48:4. Defendant's second offer of reinstatement occurred through counsel for the parties. According to Plaintiff, Defendant's counsel discussed the prospect of Plaintiff returning to the head women's lacrosse coach position, but there is no evidence in the record that shows what the terms of that offer were. Plaintiff characterized the second offer from Defendant as an attempt to gauge her interest in returning to coach the women's lacrosse team without any offer of full-time employment. Harrington Dep. 122:2–8. No other evidence in the record demonstrates that Defendant offered Plaintiff reinstatement as a full-time head lacrosse coach or another substantially similar position that would curtail her damages. As a result, Defendant has not met its burden to show that no question of fact remains concerning whether Defendant offered Plaintiff an unconditional reinstatement.

2.    Reinstatement and Front Pay

There is insufficient evidence in the record from which the Court can determine whether a genuine issue of material fact remains concerning whether Plaintiff is entitled to front pay. "An award of front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Caudle*, 224 F.3d at 1020 (quotation marks and citation omitted). "Absent any injury, an award of back pay or front pay is plainly

unwarranted under 42 U.S.C. § 2000e–5(g)(1).” *Id*. at 1021 (citing *Ford Motor Co.*, 458 U.S. at 230). If Plaintiff establishes that she suffered intentional discrimination, she may seek an award of front pay or reinstatement. *Id*. Because a question of fact remains concerning whether Defendant discriminated against Plaintiff by refusing to offer her a full-time position, the Court cannot determine whether Plaintiff is entitled to reinstatement or front pay. The record is also devoid of conclusive evidence that establishes whether Plaintiff is entitled to the preferred remedy of reinstatement, *Gotthardt*, 191 F.3d at 1156, or front pay, *Caudle*, 224 F.3d at 1020. As a result, that question must be left to the jury.

**B.    Causation**

Defendant argues that the evidence shows that Plaintiff did not resign because of gender discrimination, as she claims, but because she wanted to pursue a career change to become an emergency medical technician (“EMT”). Def. Mot. 27–28. An employee’s voluntary resignation for a reason unaffected by the employer’s discrimination terminates the employee’s right to seek damages. *See Caudle*, 224 F.3d at 1020 (explaining that the purpose of Title VII’s remedies is to make the plaintiff whole). Defendant relies on a statement Plaintiff made in her job application to Metro West Ambulance in which she indicated that she left George Fox to pursue a career as an EMT. Bernstein Decl. Ex. 9b, ECF 22-1. While Defendant is free to argue that at trial, there is significant evidence in the record to support Plaintiff’s claim that the reason she resigned from George Fox was because it failed to give her a full-time position and instead gave male coaches full-time employment. *See, e.g.*, Harrington Decl. ¶ 11; Stephenson Decl. Ex. 9 (“Kramer Decl.”) ¶ 11, ECF 31-9; Beaty Decl. ¶ 11; Coulton Decl. ¶¶ 8–10, ECF 31-12. As a result, Plaintiff has raised a question of fact about causation of her damages that precludes summary judgment.

**C.    Emotional Distress**

Defendant argues that Plaintiff cannot establish that she suffered emotional distress and other noneconomic damages because she did not seek medical or mental health care. Def. Mot. 28. Testimony of Plaintiff and her friends and family is sufficient evidence, however, to support an award of compensatory damages for emotional distress. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000) (upholding jury award of emotional distress damages based on testimony of Plaintiff and her family and noting that "objective evidence" is not required). Plaintiff testified that she experienced stress, loss of sleep, and feelings of guilt, lack of self-worth, and anxiety. Harrington Dep. 177:19–23, 178:13–21. Her assistant coaches also indicated that Plaintiff was disheartened and frustrated. Coulton Decl. ¶ 5; Beaty Decl. ¶ 11. That is sufficient evidence from which a jury could determine whether and to what extent Plaintiff is entitled to damages for emotional distress. *See Passantino*, 212 F.3d at 513.

### D.    Injunctive Relief

Defendant argues that Plaintiff's claim for injunctive relief must be dismissed as a matter of law because she cannot satisfy the *Winter* test for issuing an injunction, the injunction her Complaint alleges the Court should issue is overbroad and vague, and her requested injunction amounts to nothing more than a mandate to obey the law. Def. Mot. 29–30. Plaintiff's complaint seeks injunctive relief "enjoining George Fox form engaging in any employment practice which discriminates on the bases as alleged in this Complaint." Compl., Prayer for Relief ¶ 4. Fed. R. Civ. P. 65(d) provides that when a court issues an injunction, the court must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Under Title VII, a court may enjoin an employer from engaging in unlawful employment practices if it has engaged in or is engaging in an intentional unlawful employment practice. 42 U.S.C. §

2000e-5(g); *E.E.O.C. v. Goodyear Aerospace Corp.*, 813 F.2d 1539, 1544 (9th Cir. 1987). The Ninth Circuit has not adopted an absolute rule precluding district courts from issuing so-called "obey the law" injunctions. *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (citing *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978)).

It is premature at this stage of the case to determine whether a permanent injunction should issue. First, Plaintiff has not moved for an injunction. Thus, she is not required at this stage to satisfy the *Winter* test for issuing an injunction. A question of fact remains concerning whether Defendant intentionally engaged in an unlawful employment practice, which is required before the Court can enjoin an employer from engaging in the unlawful practice. 42 U.S.C. § 2000e-5(g); *Goodyear Aerospace Corp.*, 813 F.2d at 1544 (holding that the district court prematurely denied a permanent injunction at summary judgment stage in part because questions of fact remained concerning liability). Thus, the Court cannot determine whether an injunction should issue at this stage of the case.

Defendant relies on authority from other circuits to argue that Plaintiff's prayer for injunctive relief is impermissibly overbroad and vague, which raises due process concerns. But the cases cited by Defendant stand for the proposition that the terms of an injunction—not the plaintiff's prayer for injunctive relief—must be stated with specificity and meet the requirements of Fed. R. Civ. P. 65. *See E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013) (holding that "obey-the-law" type injunctions are overbroad in the sense that they depart from the "traditional equitable principle that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation"); *H. K. Porter Co., Inc. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24, 27–28 (7th Cir. 1977) (holding that violation of court order did not give rise to civil contempt remedies because the order did not

meet the specificity and other requirements for an injunction under Fed. R. Civ. P. 65(d)).

Defendant has provided no authority to support its argument that Plaintiff must plead her prayer

for injunctive relief with the same level of specificity required when the Court issues a

permanent injunction under Fed. R. Civ. P. 65. As a result, Defendant has identified no basis for

the Court to summarily dismiss Plaintiff's claim for injunctive relief at summary judgment.

*Goodyear Aerospace Corp.*, 813 F.2d at 1544.

## CONCLUSION

Defendant's Motion for Summary Judgment [21] is GRANTED IN PART. Plaintiff's

Equal Pay Act claim is dismissed with prejudice. Defendant's Motion for Summary Judgment is

otherwise denied.

IT IS SO ORDERED.


DATED: _February 17, 2021_____.



MARCO A. HERNÁNDEZ
United States District Judge